UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

GREENWOOD 950 LLC                     CIVIL ACTION NO. 25-cv-009

VERSUS                                MAGISTRATE JUDGE HORNSBY

MILAM & CO CONSTRUCTION INC ET AL

**MEMORANDUM RULING**

**Introduction**

Greenwood 950, LLC ("Greenwood") alleges that it was not paid for all of the work it did in connection with a construction project on which the general contractor was Milam & Co Construction, Inc. ("Milam, Inc.") and the owner was Penske Truck Leasing Co., LP ("Penske").  Milam, Inc. obtained a lien release bond from Merchants Bonding Company ("Merchants") and filed it in the mortgage records.  The court, based on the filing of that bond, (1) granted summary judgment for Penske and dismissed it from the case and (2) allowed Greenwood to amend its complaint and add Merchants as a defendant. Greenwood 950, LLC v. Milam & Co. Constr. Inc., 2025 WL 1969930 (W.D. La. 2025).

Greenwood's principal claim is that Milam, Inc. breached the terms of an oral agreement by not purchasing from Greenwood a certain amount of fill dirt, thus incurring a $2 per yard fee for Greenwood's disposal of overburden dirt, and not paying Greenwood the fee invoice for $67,060.[1]  Before the court are three motions.  First, Milam and

---

[1] The case was removed based on an assertion of diversity jurisdiction.  Greenwood is a citizen of Louisiana (Doc. 10); Penske is a citizen of Pennsylvania, Michigan, Delaware, and Japan (Doc. 8); Milam is a citizen of Delaware and Alabama (Doc. 8); Merchants is a

Merchants filed a Joint Motion for Partial Summary Judgment (Doc 49) in which they argue that (1) Greenwood sued the wrong Milam company and Milam, Inc. had no involvement in the project and (2) Greenwood's act of privilege filed in the mortgage records based on the Louisiana Private Works Act ("PWA") is invalid because (a) it named the wrong company as contractor and (b) the nature of the work Greenwood performed does not make Greenwood a proper claimant under the PWA.  Second, Milam, Inc. filed a Motion for Partial Summary Judgment (Doc 50) that attacks Greenwood's claim under the Louisiana Open Account Statute on the grounds that Milam, Inc. was not the company that contracted with Greenwood. Finally, Greenwood filed a Motion for Partial Summary Judgment (Doc. 53) that asks the court to declare that (1) Milam, Inc. was the contractor on the project, (2) Greenwood had an oral contract with Milam, Inc., and (3) Milam, Inc.'s defense that it is not the correct entity is meritless.  For the reasons that follow, all three motions will be denied.[2]

---

citizen of Iowa (Doc. 44); and the amount in controversy requirement is satisfied by the main demand for $67,060 plus a demand for statutory attorney's fees under the Louisiana Open Account Statute.  Statutory fees count toward the amount in controversy, Foret v. Southern Farm Bureau Life Ins. Co., 918 F.2d 534, 537 (5th Cir. 1990), and it is more likely than not that a reasonable fee if Greenwood were to prevail on its open account claim would exceed the $7,940 that would bring the total to $75,000.

[2] The original parties—Greenwood, Milam, and Penske—filed written consent to have this case decided by a magistrate judge.  Judge Hicks, pursuant to 28 USC § 636(c),  entered an order of reference to the undersigned magistrate judge to conduct all further proceedings and enter judgment.  Docs. 15 ¶ 10, 16 & 17.  After Merchants was added as an additional defendant, Merchants also filed written consent to have the case decided by a magistrate judge.  Doc. 64.

**Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a).  A fact is "material" if it might affect the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986).  A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party.   Anderson, supra; Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986).  If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine dispute of a material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1355-56 (1986).

**The Summary Judgment Evidence**

The record shows that there is a Milam corporation and a Milam LLC which share common ownership/membership.  Penske contracted with a Milam company to act as general contractor and build a 5-bay maintenance building on about 10 acres of land owned by Penske.  The total price was more than $10,000,000.  Billy Kirk and Ryan Robinson worked on the project as construction site supervisors for a company they referred to as Milam.  Neither man was aware that there was more than one Milam entity, nor did they know which particular Milam company was  the contractor on the project.

Engineers tested the soil on the Penske property and determined that some of it would have to be removed and replaced with soil of a more suitable quality.  Mr. Robinson testified at his deposition that someone gave him a phone number for Greenwood, and he contacted David Poston with Greenwood about the possibility of (1) having Greenwood remove the "overburden" or soil that had to be removed from the site and (2) purchasing "select fill dirt" from Greenwood that met the engineers' requirements.  Robinson, Kirk, and Poston met at the site more than once to discuss the terms of such an arrangement.

Mr.  Poston testified at his deposition that he is one of two members in Greenwood, and he runs the company's three active dirt pits.  He went to the Penske construction site and discussed the potential work with Mr. Kirk and Mr. Robinson.  All three men testified in their depositions that there was no written contract.  Mr. Poston said that they did, however, reach a verbal (oral) agreement between Greenwood and Milam.  Mr. Poston testified about the terms of the agreement both in his deposition (Doc. 49-6) and in an affidavit (Doc. 53-6) filed in support of his summary judgment motion.

Mr. Poston's affidavit is more precise, so the court will look to it to describe the alleged terms of the oral contract that Greenwood relies upon.  Per Mr. Poston, the terms were that Milam would purchase from Greenwood 60,000 cubic yards of select fill at $4.50 per yard. Greenwood would receive all of the overburden (dirt removed from the site) from the construction site for free and place it in its dirt pit.  Greenwood arranged for trucks to haul the dirt by contracting with them at $100 per hour, for which it billed Milam $130 per hour.

The next alleged term of the contract is the basis of this lawsuit.  Mr. Poston testified that the parties agreed that if Milam did not purchase at least 60,000 cubic yards of select fill, then Greenwood would charge Milam $2 per yard for receipt of the overburden.  He emphasized, "During each of approximately twenty times I met with Ryan Robinson throughout 2024 to discuss this matter, I reminded him that it was our agreement that should Milam not purchase the 60,000 cubic yards of select fill, that Milam would have to pay the $2.00 per cubic yard for overburden."  He added, "Ryan Robinson never objected to nor disputed that this was the agreement between Greenwood and Milam, either in January 2024 or in any of the subsequent meetings and discussions."

Ryan Robinson testified in a deposition that, from his memory, Greenwood was going to take the spoils (overburden), and in return Milam would purchase from Greenwood whatever amount of select fill it needed (with no particular volume commitment).  He denied that there was any discussion about a potential $2 per yard fee or other charge for the overburden if Milam did not purchase a certain amount of select fill. Robinson recalled telling Poston that he and Kirk had to get approval of the deal from the Milam office.

Mr. Robinson testified that he and Kirk probably then spoke to Milam project manager Brandon Nelson to obtain approval for the deal.  He said that he told Nelson that Greenwood agreed to take the overburden as long as Milam "brought in the dirt that we needed to purchase from [Greenwood]."  There was no email or other written record of the terms that Robinson conveyed to Nelson by phone call.  Robinson also said that he was the person that would have told Greenwood where invoices were supposed to be sent.  He

believed that he directed that the invoices be emailed to him, and he would forward them to the office.

Billy Kirk testified that an agreement was reached that Milam would pay the contracted truckers' time for hauling the spoils away and then buy from Greenwood whatever amount of dirt Milam needed. He did not recall any conversation about a $2 charge for overburden if Milam did not purchase an equal amount of fill dirt.

Milam employees used excavators to remove the overburden dirt from the Penske site and load it into the Greenwood-contracted trucks. Greenwood hauled away a total of 33,530 yards of overburden and put it in Greenwood's dirt pit. Milam paid all the related transportation invoices. Poston affidavit, Doc. 53-7, ¶¶ 11-12.

There is testimony that, as the project progressed, the soil at the site was affected by rain, or there were changes in the engineering requirements. For whatever reason, Milam filled some of the areas, from which overburden had been removed, with either rock or select fill obtained from elsewhere (perhaps from another area of the Penske property). What is important is that Milam did not buy that rock or select fill from Greenwood. In the end, Milam purchased only 220 cubic yards of select fill from Greenwood.

Greenwood believed that this triggered the $2 per yard overburden fee under the terms of the contract. It invoiced Milam $67,060, which represented $2 per cubic yard for the 33,530 cubic yards of overburden that Greenwood had accepted in its pit. Milam had paid each of the prior invoices sent by Greenwood, but it refused to pay that final invoice, which led to this lawsuit. Mr. Poston insisted that the $2 additional fee "was agreed at the very start." He explained that the additional fee was necessary if he did not sell an equal

amount of select fill.  This was because accepting overburden required "a lot of work" with a bulldozer to process it into the Greenwood pit.  Poston said that he would normally charge $4 a yard to someone who only wanted to deposit overburden.

**Oral Contract: Burden of Proof**

If this case goes to trial, the first question for the jury will be whether Greenwood had an enforceable contract with Milam (any Milam) that included a term that Milam would owe a $2 per yard overburden charge if it did not buy a certain amount of fill from Greenwood.  Mr. Poston, Mr. Kirk, and Mr. Robinson all testified that there was no written agreement.  Only Mr. Poston testified that the agreement included the $2 charge, and the other two witnesses denied that there was any such discussion.

Because Greenwood is seeking enforcement of an oral contract for more than $500, it appears that this claim is governed by the Civil Code requirement that the contract be proved by the testimony of "one witness and other corroborating circumstances."  La. Civ. Code art. 1846.  A plaintiff may serve as its own "one witness," but the "other corroborating circumstances" must come from a source other than the plaintiff.  Read v. Willwoods Community, 165 So.3d 883, 887-88 (La. 2015) (reversing a jury verdict for a plaintiff who testified that his oral employment contract included a 5-year term but lacked corroborating evidence); Suire v. Lafayette City-Parish Consol. Government, 907 So.2d 37 (La. 2005) (reinstating trial court's grant of summary judgment for the defendant when the plaintiff offered nothing but his own uncorroborated deposition testimony as proof of an oral contract); and Guidry v. Savoie, 194 So.3d 1184, 1192 (La. App. 5th Cir. 2016) (affirming

finding an oral contract when "Mr. Guidry's testimony was corroborated by the testimony of Mr. Bourgeois and Mr. Nobile as well as by documentary evidence").

Neither defendant moved for summary judgment on this issue, so Greenwood is not obligated to produce corroborating evidence at this stage of the case.  The court mentions it because the trial is just around the corner.  The parties, as they prepare their case presentation, jury instructions, and proposed verdict form, should keep in mind that if Greenwood is unable to convince the jury that it has met its burden on this preliminary issue, then neither the jury nor the court will need to address any of the wrong-defendant and PWA issues discussed below.

**Private Works Act**

After Greenwood's $2 fee invoice went unpaid, Greenwood filed in the mortgage records a document titled Act of Privilege, which invoked the PWA, described the Penske property, and asserted Greenwood's claim against Milam, Inc. and Penske for $67,060.  This effected a lien against Penske's property.  Milam, Inc. then obtained a lien release bond from Merchants and recorded it.  That resulted in the extinguishment of Greenwood's claim against Penske and the associated lien against Penske's property, with Merchants essentially stepping into Penske's shoes.

Merchants asks for summary judgment on the grounds that Greenwood does not have a claim that is enforceable against the Merchants bond under the PWA.  Greenwood responds that the PWA provides that "the following persons have a claim against the owner and a claim against the contractor to secure payment of the following obligations arising out of the performance of work under the contract: (1) Subcontractors, for the price of their

work." La. R.S. 9:4802(A)(1). "A subcontractor is one who, by contract made directly with a contractor … is bound to perform all or part of a work contracted for by the contractor." La. R.S. 9:4807(C). "A work is a single continuance project for the improvement, construction, erection, reconstruction, modification, repair, demolition, or other physical change of an immovable located in this state or its component parts." La. R.S. 9:4808(A).

The summary judgment evidence shows that Greenwood contracted with truck drivers to go to the Penske site, where Milam employees used excavators to load the trucks with overburden, which the drivers then delivered to the Greenwood pit, where Greenwood employees verified the incoming volume and used Greenwood equipment to put the overburden in the right place and in the right way. Mr. Poston admitted that no Greenwood employees did any physical work at the Penske site.

Billy Kirk testified that the outgoing amounts of overburden were monitored by himself, Ryan Robinson, and "the trucking company had a guy sitting at the entrance counting trucks as well." He said that "the guy that kinda ran the truckers and me and Ryan would confer on the count at the end of each day," and there usually was no discrepancy. Mr. Poston testified that when Greenwood delivered fill dirt, his employees, mainly Leroy Sanchez, did the loading at Greenwood, but he never identified any employee who verified the amounts of outgoing overburden at the Penske site. The "trucking company guy" does not appear to be identified in the record, and since Greenwood contracted to provide the trucks, it is possible that the man was a Greenwood employee or representative. This is an unresolved factual issue that may be material to the PWA issue.

Page **9** of **18**

Merchants argues that the only outstanding amount claimed by Greenwood, and for which it filed its lien, is solely the fee for accepting overburden.  Merchants argues that hauling away overburden is not "work" under the PWA because it did not contribute to improvement of the immovable.  As outlined above, the PWA provides that subcontractors have a claim against the owner for the price of their work.  A subcontractor is defined as one who, by contract with a contractor, is bound to perform "all or a part of a work contracted for by the contractor."  A work includes a project for the construction of an immovable.  The PWA also contemplates that the placing of fill dirt, leveling of the land surface, or performance of similar work in preparation for the construction of a building is work.  This is evidenced by a provision that such preparatory work shall be deemed a separate work (which is relevant to timeliness and ranking issues) to the extent it is not part of the contractor's work.  La. R.S. 9:4808(C).  If such dirt work was not work that potentially qualified for lien rights under the PWA, there would be no need for that provision.  That provision does not expressly list hauling away spoil, but it describes similar activities.

The contract between Milam and Penske called for Milam to build a five-bay facility, with the project to include all work described more particularly on plans, plats, construction schedules, and detail specifications listed in the contract.  Doc. 53-14.  The record does not appear to include those detailed plans and specifications, so it is quite possible that they include the requirement that Milam remove from the site overburden that is not suitable to meet the required engineering standards.  If Milam, as contractor, was required to perform that task as part of its contractual duties, and Greenwood bound itself

to perform all or part of that work, then Greenwood arguably meets the definition of a subcontractor who has a claim under the PWA for the price of its work.

The parties have not presented definitive case law, but Greenwood points to Big S Trucking Co, Inc. v. Gervais Favrot, Inc. 450 So.2d 369 (La. App. 1st Cir. 1983), in which the contractor hired a subcontractor to install parking lots and perform foundation work, that subcontractor arranged with a trucking company for the removal of surplus dirt, and the trucking company contracted with Big S "for the trucks and labor needed to haul the dirt." The details of what labor Big S performed and where it performed it are not described in the decision. It was the contention of Favrot, much as Merchant argues here, "that hauling dirt away from the construction site is neither the performance of work nor the furnishing of materials for the erection or construction of immovable property; therefore, plaintiffs' claims are not within the ambit of the Private Works Act." Id. at 371. The appellate court did not buy that argument and held that the claim was potentially lienable; summary judgment against Big S was not appropriate. Big S cited Hunt v. La. Chere Maison, Inc. 316 So.2d 850 (La. App. 1st Cir. 1975), where a claim against an owner for hauling four loads of trash from a construction site was held lienable under the PWA.

The PWA was enacted to facilitate the construction of improvements on immovable property. It serves that purpose by granting certain rights to enumerated persons to facilitate recovery of the costs of their work from an owner with whom they lack privity of contract and could not otherwise sue. Seab v. Furlow, 338 So.3d 1244, 1249 (La. App. 2d Cir. 2022). Merchants points out that Louisiana courts often state that the PWA must be strictly construed because it is in derogation of general contract law. But Louisiana courts

also state that, "In interpreting the Private Works Act, care must be taken not to overlook the legislative intent and fundamental aim of this act, which is to protect materialmen, laborers, and subcontractors who engage in construction and repair projects."  Crawford Elec. Supply Co., Inc. v. Loga Holdings LLC, 406 So.3d 634  (La. App. 1st Cir. 2025), citing Bear Industries, Inc. v. The Hanover Insurance Co., 241 So.3d 1159, 1162 (La. App. 1st Cir. 2018).

Considering the cited Louisiana decisions, the lack of complete information about the scope of Milam's obligations under its contract with Penske, and the purpose of the PWA, the court finds that Merchants is not entitled to summary judgment.  If Greenwood prevails on its claim that it had an oral contract that entitled it to collect the $2 overburden fee, then this issue will require decision, based on the full record, if Greenwood wants to recover the amount of its final invoice from the Merchants bond.  Merchants also argues that Greenwood's PWA claim fails because Greenwood named the wrong contractor in its lien.  That issue is addressed below.

**Which Milam?**

All of the remaining summary judgment contests are based on whether Greenwood sued the correct Milam entity.  Greenwood is adamant that it contracted with the named defendant, Milam & Co. Construction, Inc.  The defendants insist that Greenwood's business dealings were with a different entity named Milam & Co. LLC Alabama.  This dispute is not capable of resolution on the summary judgment record, but perhaps the following discussion will promote a sharper focus as the case moves toward trial.

First, there is the contract between Penske and its general contractor.  The contract states in its introduction that it is between Penske as owner and "Milam & Co" as contractor.  Paragraph 33 of the contract lists contact information for the parties and again describes the contractor as Milam & Co.  The signature page, under the signature line for the contractor, lists "Milam & Co., LLC of Alabama."

Next, there is the deposition testimony, Greenwood's invoices, and the Milam checks that paid those invoices.  Mr. Poston testified that he made his arrangement with Billy Kirk and Ryan Robinson, who acted on behalf of Milam (name not further specified).  One of those men, probably Robinson, provided Poston with information about where to send invoices.  Robinson said that he believed he told Poston to email the invoices to him and that he would forward them to "our office."

Greenwood actually sent its invoices to "Milam & Co Construction" at 2748 Alton Road, Suite 116, Birmingham AL 35210.  Each of the several invoices was paid by a check written by "Milam & Co. Construction, Inc." that listed the same Alton Road address as on the invoices.  When Greenwood sent the final invoice for $67,060, it received an email from Pat Streetman that stated the invoice had "been deleted from our system and there will be no payment made."  Streetman's signature line on the email indicated that she worked for "Milam & Co Construction" at the Alton Road address.  Streetman did not suggest that Greenwood take up the issue with the "real contractor."

Greenwood filed suit in state court against Milam & Co. Construction, Inc., the same company that had paid all earlier invoices.  That company, which will now be referred to as Milam, Inc., removed the case and alleged that it was a corporation organized under

Delaware law with its principal place of business in Alton, Alabama.  Milam, Inc. stated in its answer that it was not the entity that operated as general contractor on the Penske project.  It said in its Rule 26 report that the company that had dealings with Greenwood on the Penske project was Milam & Co. LLC of Alabama.  This company will be referred to as Milam Alabama.

The Milam identity issue was discussed in a prior ruling, and the court suggested that Greenwood give serious consideration to whether it wished to amend to make Milam Alabama a substitute or additional defendant.  The court warned that "Greenwood should add Milam Alabama now, or it will be risking its whole case on proving that Milam, Inc. was the contractor."  Doc. 35.  Greenwood has remained adamant, including in its recent filings, that it sued the only correct defendant, Milam, Inc.  Milam Alabama is not a party, and it is too late to add it now.

As noted above, it will require a resolution of factual issues beyond what can be decided on summary judgment to determine whether Greenwood contracted with Milam, Inc. or Milam Alabama.  There are also factual issues that preclude summary judgment with respect to Greenwood's arguments that Milam, Inc. tacitly ratified the contract.  It is also possible that Milam, Inc. accepted the contract by performance when it repeatedly paid the invoices for Greenwood's work and communicated with Greenwood about the contract in a way that suggested it was a party to the agreement.  See La. Civ. Code Articles 1843 (ratification), 1927 (consent may be made by action or inaction that is clearly indicative of consent), and 1939 (contract may be formed through acceptance by performance).  Those issues will have to be resolved at trial.

Milam, Inc. represents that it is not even registered to do business in Louisiana and had nothing to do with the Penske contract.  It responds to the fact that it paid all of Greenwood's invoices on the job with the argument that it is not illegal to pay the debts of another company.  It also contends, without pointing to evidence or legal authority, that this is common in the construction industry.

Milam Alabama, on the other hand, is said to be authorized to do business in Louisiana and hold a Louisiana contractor's license.  Greenwood argues that Milam Alabama does not even exist, but this argument may be based on a misunderstanding stemming from the "distinguishing term" provision of Louisiana law concerning the authorization of foreign companies to do business in Louisiana.  The following explanation is not certain, but it is suggested by the records submitted by the parties.

An LLC was organized under Alabama law in June 2008 under the name Milam & Co., LLC.  That business later applied in Louisiana to become authorized to conduct business in this state.  That same company is designated as Milam & Co. LLC Alabama on its certificate of authority to conduct business in Louisiana.  Why did it add Alabama to its name?

The addition of Alabama is probably the result of a statutory provision that applies when a foreign entity applies for authorization to conduct business in Louisiana but there is already an entity using the same or similar name in Louisiana.  It provides, "If its real name is unavailable, the foreign limited liability company may add a distinguishing term upon the records of the secretary of state to its name for use in this state."  La. R.S.  12:1344. There is a similar provision for foreign corporations that apply for a certificate of authority

in Louisiana.  La. R.S. 12:303(B).  Most states have similar provisions for the use of an alternate, fictitious, distinguishing, or assumed name when a company's actual name is not available in a foreign state where it applies for authorization to do business.  For example, the Model Business Corporation Act, adopted to some degree in Louisiana and more than 30 other states, provides in § 15.06 that a foreign corporation may use an alternate name to register to do business in a state where its actual name is not available.  Milam states that "presumably" this is the reason for the addition of Alabama to the name of Milam & Co., LLC when it applied for authorization to do business in Louisiana.  That appears to be a logical assumption, but there is no record evidence on the issue.

The use of the distinguishing term does not mean, as Greenwood suggests, that there is not a true legal entity behind Milam & Co. LLC Alabama.  That name is merely the name under which the Milam LLC that was organized in Alabama is required to do business in Louisiana.  "Use of a fictitious business name or trade name, such as d/b/a, does not create a separate legal entity." 6 Fletcher Cyclopedia of the Law of Corporations § 2442.  "A fictitious name is merely descriptive of a person or corporation who does business under another name." Id.  A company that conducts business under a trade or alternate name can be sued under its legal name for debts incurred under its trade name.  Ready Portion Meat Co. v. Michael's, A Catering Experience, 542 So.2d 207, 209 (La. App. 3d Cir. 1989).  See also La. Code Civ. Proc. art. 736 ("A person who does business under a trade name is the proper defendant in an action to enforce an obligation created by or arising out of the doing of such business.").  Milam Alabama's use of a distinguishing term in its name for doing business in Louisiana is no different.

If one were to sue Milam Alabama, the designation of the defendant should be something like Milam & Co., LLC, an Alabama limited liability company that is authorized to do business in Louisiana as Milam & Co., LLC Alabama.  The Alabama LLC would be responsible for any resulting judgment.  But that does not matter because Greenwood has not sued Milam Alabama.

If a foreign LLC operates in Louisiana under a different name, as required by law, the registration of that name does not give rise to a separate entity.  Nor  does the use of such a distinguishing term, as required by law, necessarily indicate a nefarious attempt to avoid legal responsibility.  It is merely a means of complying with Louisiana law, which is aimed at avoiding legal confusion with a company that is already on the books in Louisiana with the same or a similar name.  The Louisiana secretary of state's records list multiple Milam entities, so that is a likely explanation of why the Milam Alabama was used when the LLC applied to do business in Louisiana.  Perhaps the trial will include testimony or other evidence on this issue, but this certainly appears to be the most likely reason behind the different name.  Greenwood has sued only Milam, Inc., so it will have to prove by a preponderance of the evidence the existence of an oral contract that includes a $2.00 overburden fee and that Greenwood formed that contract with Milam, Inc., whether by express agreement, tacit ratification, or acceptance by performance.

For the reasons stated above, **Milam and Merchants' Joint Motion for Partial Summary Judgment (Doc 49)**, **Milam's Motion for Partial Summary Judgment (Doc 50)**, and **Greenwood's Motion for Partial Summary Judgment (Doc. 53)** are all **denied**.

THUS DONE AND SIGNED in Shreveport, Louisiana, this the 9th day of July, 2026.

Mark L. Hornsby
U.S. Magistrate Judge
